EXHIBIT A

FILED IN DENVER
DISTRICT COURT
DENVER, COLORADO

2020 AUG 31 AM 11:05

DATE FILED: August 31, 2020
CASE NUMBER: 2020CV381

| DISTRICT COURT, COUNTY OF DENVER, |
|---|
| STATE OF COLORADO |
| 1437 Bannock Street |
| Denver, Co 80202 |

| | COURT USE ONLY |
|---|---|
| **Plaintiff:  IBRAHIM DALIS** | |
| **V.** | |
| **Defendants: Lyft, INC.** | |
| ――――――――――――― | |
| **Defendant DALIS' Contact Information:** | |
| **Ibrahim Dalis** | |
| **17509 E. Temple Dr.** | |
| **Aurora, Co 80015** | |
| **(720) 297 2490** | **Case Number:** |
| **dalisabe@gmail.com** | 20CV381 |
| | **Civil Division:** |
| | 269 |

| **COMPLAINT, JURY DEMAND AND PETITION FOR DECLARATORY JUDGMENT** |
|---|

20CV381-1

The Plaintiff, Ibrahim Dalis, pro se, hereby submits his COMPLAINT, JURY DEMAND AND PETITION FOR DECLARATORY JUDGMENT against Defendant Lyft, INC. and as grounds thereto states and alleges the following:

## **VENUE AND JURISDICTION**

1.   Lyft is a business entity with nationwide offices, operates in the State of Colorado and is registered with the Colorado Secretary of State.

2.   DALIS is exempt from the Arbitration Clause contained in Section 17 of the TOS (Terms of Service) since DALIS opted out. Evidence of the opt-out (email confirmation dated sometime in May 2018) is available upon request. The following is the text of the email sent to Lyft Legal Support Team:

[Opt-out

| | May 14, 2018, 4:54 PM |
|---|---|
| **dalisabe <dalisabe@gmail.com>** | |

to
arbitrationoptout@
Lyft.com

Hi,

My name is Ibrahim Dalis. I have been a Lyft driver for four years. After having a tense debate with the Lyft Support team over the adequacy of the rating system, I tried to "go online", only to find out that the Lyft App would not let me login without accepting the "terms of use" to continue driving. Of course, I did not consent to the new terms because they contained a provision about arbitration which limits access to courts in cases of dispute with Lyft. So I visited a local hub in Aurora/Denver and was trying to explain the situation to Sean Dolan, a Lyft rep at the hub. Sean accidentally pushed the "I accept" button. So I expressed my frustration about the accident and confirmed that I did not accept the terms. So I am now stating and confirming that I do not accept the arbitration clause in the use  terms and that I never opted in to opt out. For whatever it is worth now, I would like to reverse the accidental opt-in and confirm that I am opting out; that is, I do not accept the arbitration clause of the Lyft use agreement. If my position is not clear enough, please do not hesitate about contacting me for more clarification.

Name: Ibrahim Dalis

Phone: 720 297 2490

Email: dalisabe@gmail.com

Address: 17509 E Temple Dr

       Aurora, Co 80015

Thank you.

Ibrahim ]

3.      At all times relevant, DALIS had been a resident of Colorado during which he worked as a driver for Lyft from August 2014 until November 2018. All relevant events took place in the State of Colorado during this period.

4.      DALIS invokes and asserts the personal and subject matter jurisdiction of this Court over this Complaint, Jury Demand and the Petition for Declaratory Judgment.

## SUMMARY OF CLAIMS

5.      **Misclassification**. Lyft classified DALIS as an independent contractor throughout the work period relevant (for about 4 years and 3 months) but without sufficient independence, flexibility or ability to realize profit. On the other hand, Lyft treated DALIS as an employee but without employment benefits, to reduce its overhead, avoid regulatory cost and liability, achieve competitive edge with rivals and establish itself as a transportation company in the eyes of the public. DALIS was subject to control (supervision, evaluation, discipline and termination by Lyft.) The misclassification was willful, unconscionable and against public policy. As a result of the misclassification, DALIS suffered economic and non-economic damages.

6.      **Breach of contract.** A contract denoted as the "TOS" (Terms of Service) existed between DALIS and Lyft. Lyft declared DALIS in the TOS as an

independent contractor. However, Lyft deprived DALIS of the independence, flexibility and the ability to realize profit typically enjoyed by independent contractors (someone like a small business plumber, for instance.) Lyft disciplined and terminated DALIS. DALIS could have not been an independent contractor due to Lyft's policies and practices. Lyft's policies and practices constituted a breach of contract. DALIS suffered damages as a result.

7.  **Unjust enrichment**. Lyft enriched from the losses of DALIS for which DALIS was never compensated. Lyft avoided paying employment benefits to DALIS and controlled the pricing of the services DALIS provided to reduce its overhead, avoid regulatory cost and liability, achieve competitive edge with its rivals while also depriving DALIS of the independence, flexibility and the ability to realize profit as an independent contractor. It was unjust for Lyft to retain the benefits Lyft achieved at the expense of DALIS without commensurate compensation.

8.  **Bad faith and unfair dealing**. Lyft declared Dalis an independent contractor in theory only but in practice, Lyft treated Dalis as an employee exercising all kinds of control over Dalis, which control unfairly violated the good faith and fair dealing covenant implied in every contract. Most importantly, Lyft assigned itself the power to arbitrate disputes between Dalis and some unhappy riders. In particular, disputes that involve serious charges, which normally require judicial process and extensive due process Lyft lacked the legitimate forum to conduct. Lyft typically was biased in favor of the

complaining rider in suit of promoting business policies of patronizing consumers at all expense without regard to the nature of the contracted relationship with the worker (driver.) The bad faith and unfair dealing resulted in unwarranted decisions or judgments by Lyft against Dalis ending in serious deactivations and/or terminations. Dalis suffered economic and non-economic damages as a result.

9. **Loss of wages and employment benefits.** DALIS alleges that Lyft violated the Fair Labor Standards Act ("FLSA"). §§ 201 *et seq*., 29 U.S.C. § 216(b), and the Colorado Wage Order 35, which protected DALIS from being misclassified and underpaid in wages.  These violations included the failure to: (1) reimburse DALIS for work expenses, (2) pay overtime, (3) pay minimum wage, (4) paid breaks, (5) provide itemized wage statements, and (6) keep accurate payroll records.

10. DALIS also brings claims under CESA (Colorado Employment Security Act) for failing to contribute in unemployment insurance and worker's compensation owed along with penalties applicable.  DALIS alleges that Lyft failed to pay the contributions due by misclassifying DALIS as an independent contractor.

11. In addition, Lyft is subject to several State and Federal penalties for violating Colorado and/or Federal Labor Standards. DALIS is seeking such penalties.

12.  Despite the technical variations in the way different State and Federal agencies look at whether a worker is an independent contractor or an employee, all agencies seem to agree that in reality, DALIS was an "employee of Lyft" in the light of the following factors:

  a.  Integrality of Business.
  b.  Mutual Dependence.
  c.  Duration of Relationship.
  d.  Degree of Control.

13.  Under the Colorado Employment Security Act (CESA), an independent contractor is a worker who "is free from control and direction in the performance of the service" and "is customarily engaged in an independent trade". The CESA has nine specific factors to establish an independent contractor relationship.  If a worker cannot be shown to be an independent contractor, the worker is presumed to be an employee. https://www.colorado.gov/pacific/cdle/independent-contractors

14.  The US Internal Revenue Service (IRS) has a general definition of an independent contractor relationship. It is when "the payer [employer] has the right to control or direct only the result of the work and not what will be done and how it will be done." To determine the worker classification of an individual, the IRS will look at the specific facts of the case and 'test' them to see if they fit the definition.

15.   Similarly, the US Department of Labor (DOL), under the Fair Labor Standards Act (FLSA), has a broad approach to this. It will look at the "'economic reality' rather than the 'technical concepts'" to determine whether a person is an employee or an independent contractor.

16.   The Colorado Supreme Court ruled that determining whether a worker is "customarily engaged in an independent trade, occupation, profession, or business" in order to be deemed an "independent contractor" under Colorado's unemployment insurance benefits laws requires an evaluation of the ***totality of the circumstances*** surrounding the relationship between the worker and the putative employer. In two companion cases, the Court rejected a stringent, single-factor test for determining whether a worker is an employee or independent contractor for purposes of unemployment insurance tax liability and benefits. Reversing decades of case law, the Court ruled that no single factor is dispositive of an employer-employee relationship. Instead, courts and agencies may consider nine factors enumerated in a statute pertaining to independent contractor agreements, as well as "any other information relevant to the nature of the work and the relationship between the employer and the individual. (*ICAO v. Softrock Geological Servs.*, 2014 CO 30; *Western Logistics, Inc. v. ICAO*, 2014 CO 31.)

## FACTUAL BACKGROUND AND ALLEGATIONS

### (DALIS was an Employee of Lyft under the FLSA and Colorado Law)

17. **Lyft's business.** Lyft is an App-based transportation provider that has been based in San Francisco, California since 2012. In March 2019, Lyft's shares were offered to the public and now trade on the NASDAQ stock exchange.

18. Lyft provides riders with transportation by assigning Lyft drivers to riders using a mobile phone application known as (the "Lyft App").

19. Once the driver and the rider are paired, Lyft does not guarantee the results and claims to distance itself (only in theory) through wide disclaimers contained in the TOS from the actions and omissions of the driver and the rider.

20. The driver then transports the rider, and the rider pays Lyft directly for the service provided by the driver with a credit card process built into the "Lyft App." The driver has no role in processing the payment, nor selecting the payment method or accepting cash from the rider.

21. Lyft sets the fare to be paid by the rider and communicates it to the rider via the "Lyft App." Lyft initially used to pay the driver a percentage of the entire

fare charged to the rider (80% of the fare to drivers like DALIS) plus 100% of any added tip, with Lyft keeping the rest of the fare (20% total) for itself. The fare structure however was periodically changed. In some cases, the division of the fare between the driver and Lyft was difficult to justify and appeared to be different from one fare to another. When Lyft abandoned the 80/20 division of the fare, Lyft paid DALIS less than 80% total of the fare it collected from the rider.

22.   The work that DALIS performed was in the usual course of Lyft's business – indeed, providing ride services **was and continues to** be Lyft's business.

23.   Based on personal experience as a driver, the rider equated Lyft with other taxi services such as Yellow Cab.  Most riders didn't even know the difference between a TNC (Lyft's formal business) and a taxi service, and didn't seem to care as long as they received the service from the driver.

24.   Lyft says that it "is one of the largest and fastest growing **multimodal transportation networks** in the United States." (*See* Lyft, Inc., Securities and Exchange Commission Form S-1 Registration Statement, at p. 1 (March 1, 2019)                    ("S-1                    Statement")). (https://www.sec.gov/Archives/edgar/data/1759509/000119312519059849/d63 3517ds1.htm).

25. DALIS provided the services that Lyft marketed and sold to the public. DALIS' services to Lyft were an integral part of Lyft's usual business, which was providing transportation services to the public.

26. Lyft says that it participates in the "transportation . . . market," and describes its business as "singularly focused on *revolutionizing transportation*." (S-1 Statement at pp. 3-4.)

27. Lyft's "business depends largely on [its] ability to *cost-effectively attract and retain qualified drivers*." (S-1 Statement at p. 10.)

28. Lyft earns money by providing its customers with a ride from point A to point B – a service that is wholly dependent on Lyft drivers, including DALIS.

29. Lyft currently provides self-driving car services that transports riders without the presence of a driver. By May 31st, 2019, "Lyft had completed 55,000 self-driving rides in Las Vegas.  That makes it the largest commercial self-driving program     in     the     US."     (See https://www.engadget.com/2019/05/31/Lyft-aptiv-55000-self-driving-vehicle-r ides-vegas/ )

30. When Uber, the twin sister of Lyft, argued that "it is not a 'transportation company,' but instead a pure 'technology company' that merely generates 'leads' for its transportation providers through its software," U.S. District

Judge Edward Chen commenting on Uber trying to pass itself off as "merely a technological intermediary between potential riders and potential drivers," wrote: "This argument is fatally flawed in numerous respects,… Uber does not simply sell software; it sells rides…Uber is no more a 'technology company' than Yellow Cab is a 'technology company' because it uses CB radios to dispatch taxi cabs, John Deere is a 'technology company' because it uses computers and robots to manufacture lawn mowers, or Domino Sugar is a 'technology company' because it uses modern irrigation techniques to grow its sugar cane." Chen also dismissed Uber's argument that its drivers do not provide the company a service and are therefore not employees. "It is obvious drivers perform a service for Uber because Uber simply would not be a viable business entity without its drivers," Chen wrote.

31. Likewise, Judge Vince Chhabria struck down similar arguments from Lyft, whose claim that it operates as "an uninterested bystander of sorts, merely furnishing a platform that allows drivers and riders to connect" he called "obviously wrong." "Lyft concerns itself with far more than simply connecting random users on its platform," Chhabria wrote. "It markets itself to customers as an on-demand ride service, and it actively seeks out those customers." Both judges cited other evidence characterizing the relationship between the services and their drivers as employer-employee relationships: for example, the companies exercise control over fares, and furnish their drivers with documents similar to employee handbooks, for violations of which drivers have been fired. It gives drivers detailed instructions on how to conduct

themselves. Notably, Lyft's own drivers' guide and FAQs state that drivers are 'driving for Lyft.'" ***Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015)**

32. As part of Lyft's requirements, DALIS received training on how to interact with riders, as well as Lyft's expectations and practices.

33. In addition to training, Lyft constantly posted and updated policies and information online to guide and set its expectations of DALIS and other drivers cast in the form of FAQs. Lyft did not neglect to make reference to its policies within the TOS. (See Section 19 of the TOS, "Relationship with Lyft". See https://help.Lyft.com/hc/en-us/categories/115002009967-Driving-with-Lyft) (Last visited December 26th, 2019).

34. Lyft also screens every driver, including DALIS, "before they are permitted to drive on its platform, starting with professional third-party background and driving record checks." (*See* S-1 Statement at p. 148.)

35. Lyft can terminate drivers' right to provide driving services for violating one or more of the rules that Lyft imposed by contract. DALIS was in fact terminated by Lyft (without citing specific provisions) for violating the TOS on November 4th, 2018.

36. **DALIS lacked business autonomy.** DALIS was not engaged in an independently established business. Lyft required riders who requested rides and paid Lyft directly through the Lyft App, without which DALIS couldn't operate.

37. Lyft tells drivers, including DALIS, not to solicit riders' contact information and to eject riders' requests to drive them outside of the Lyft App.

38. The "Lyft's App" has been Lyft's biggest asset (as Lyft likes to label itself an "App technology.") The "Lyft App" takes control of the entire ride event once a ride request is accepted by the driver.

39. DALIS was exclusively dependent on Lyft to identify and solicit riders for him.

40. DALIS was not allowed to hire employees to assist him in providing services for Lyft. For instance, if Dalis had another driver to assist him complete a ride that Dalis for some reason was not able to complete himself, Lyft would not and did not agree to such arrangement.

41. DALIS did not need to possess any particular or special skills other than those required to obtain a driver's license.

42.  Prior to doing driving services for Lyft, DALIS had not independently made the decision to go into the transportation business for himself. Lyft had unilaterally determined that drivers including DALIS were independent contractors while precluding them from taking the usual steps toward promoting and establishing independent businesses, such as forming business relationships with Lyft customers or otherwise promoting their services to the public.

43.  Lyft also prohibited DALIS and other drivers from setting or in any way affecting the rates of pay for their own services. For instance, in a long ride that required "deadheading" back to town, DALIS was not allowed to charge or negotiate extra charge to make up for the deadheading, which in many cases was a far costly distance.

44.  Lyft prohibits drivers from communicating with riders about future or recurring ride services before or after a ride request is accepted or completed.

45.  Lyft required drivers including DALIS to use their own cars or lease a car exclusively through Lyft partners (rental companies like Hertz) to provide rides for Lyft. Lyft required that the car be not more than certain years old or so, and it must pass automotive inspections as dictated by Lyft.

46.  Lyft required drivers including DALIS to "only provide Services using the vehicle that has been reported to, and approved by Lyft, and for which a

photograph has been provided to Lyft." TOS, P. 10(d).  One of the instances DALIS' was suspended for (deactivated temporarily) by Lyft was when DALIS' used a rental car while his approved car was in a service shop for repair.  Lyft colored the violation as a serious "safety" violation even though the rental car was in near perfect condition and met all other fitness requirements.

47. Lyft required drivers including DALIS to carry their own personal auto insurance, but Lyft also provided drivers with extra liability coverage while drivers are logged into the Lyft App and carrying riders. Lyft didn't require DALIS to carry a commercial insurance similar to what a limousine or a taxi company must carry.

48. Lyft was solely responsible for recording drivers' rides, including the time and distance for each ride, the ride fare and added Lyft fees, any tips, and for compiling drivers' rates of pay for each ride.

49. DALIS lacked managerial power to select his rides based on relevant information provided to DALIS by the "Lyft App." Within 15 seconds timed by the Lyft App, DALIS had to either accept or reject the ride or otherwise lose the business opportunity. Lyft on purpose hid the rider's destination from Dalis hence forcing him to accept all rides regardless of risk. Some rides were not profitable, but DALIS could not find out before he accepted the ride request first on arrival to the pickup location. When DALIS cancelled a ride

after suspecting that it wasn't profitable, DALIS was penalized for the cancellation since Lyft used the "cancellation rate" as a performance metric to determine his qualification for bonuses occasionally offered by Lyft.

50. DALIS lacked any significant opportunity for realizing profit and loss as Lyft reduced the role of DALIS to virtually an hour-wage worker or less in reality. Compensation was for minutes and miles driven while a rider was in the car. Waiting for a ride while doing nothing else of value, without which a ride of some value would have impossible went uncompensated.

51. Just like there was no compensation for deadheading, the "Pickup Fee" Lyft used to compensate DALIS for driving to the customer was unfairly low and was periodically reduced. Likewise, the minute and mile compensation rates were subject to several cuts by Lyft over the work period Dalis performed his services for Lyft. The fare pricing and structure which Lyft exclusively controlled was part of a more general scheme of competition with rivals like Uber, which inevitably compromised the drivers' autonomy and potential for the realization of profit.

52. DALIS' relationship with Lyft was permanent and exclusive. Lyft needed the services DALIS provided and DALIS did not have other "employers/customers" besides Lyft. DALIS was totally dependent on Lyft to earn an income.

53. DALIS lacked the amount of initiative, judgment, and foresight in an open market competition the kind required for the success of an independent contractor. DALIS did not decide except for when and for how long he was willing to be on the road logged in to the "Lyft App." Even that, Lyft didn't fully respect. For instance, at some point in time during the work relationship, Lyft started to add riders to the ride request queue while a ride was still in progress without Dalis' consent. DALIS could only increase his earnings by driving more miles and spending more hours on the road, not through any exercise of managerial skills.

54. **Lyft controls the terms of employment.** Lyft maintains uniform policies and terms of service with which all Lyft drivers, including DALIS, must comply.

55. Once DALIS passed Lyft's initial requirements, he was able to work for Lyft for potentially ***an indefinite period of time***, until DALIS quit, or until terminated by Lyft. The relationship between DALIS and Lyft did not end by completing the minute task (compare that to the plumbing task.)

56. However, Lyft may shut down DALIS' access to the "Lyft App: for a myriad of reasons, thus preventing him from obtaining and responding to ride requests.  In fact, DALIS was temporarily shut down from access to the "Lyft App" at least four (4) times during the period from August 2014 until November 2018.

57. DALIS performed work for Lyft by logging into the Lyft App, making him available for rides and visible to Lyft users, which benefited Lyft. While logged in, DALIS regularly received ride assignments quickly, sometimes receiving a new ride before completing the existing ride. DALIS often did not have to wait more than 15 minutes between ending one ride and receiving the next ride assignment. Once DALIS received an assignment, Lyft allowed him **15 seconds** only to accept the assignment, or else lose the business opportunity. There was no other option available to negotiate a delayed pickup with the rider, for instance.

58. On information and belief, until the beginning of 2018, Lyft required that DALIS accept at least 90% of ride assignments to avoid being terminated. Nevertheless, Lyft continued to use acceptance rates to determine DALIS' eligibility for certain features and help keep passenger wait times short." Lyft Help Center, "Acceptance Rate", available at https://help.Lyft.com/hc/en-us/articles/115013077708-Acceptance-rate (last visited December 2019).

59. Lyft calculates drivers' acceptance rates by adding the number of rides a driver completes to the number of rides cancelled by the rider, and dividing that number by the total number of ride assignments shown to the driver. Lyft explains that a driver's acceptance rate may decrease due to missed assignments, such as when a driver lets the timer counts down 15 seconds, and

by the driver cancellations. Lyft used "flash messaging" to warn DALIS about low acceptance rates when the same dropped.

60. Lyft drivers including DALIS are under pressure to keep their acceptance rates high because Lyft bases eligibility for certain bonuses, awards, and other benefits in part on a driver's overall acceptance rate, such as the weekly "power drive bonus" – a weekly cash bonus given to drivers for completing a certain number of rides. See Ridester, "An Introduction to the Lyft Power Driver Bonus", available at https://www.ridester.com/Lyft-power-driver-bonus/   (last visited December, 2019).

61. Although participating in bonuses offered by Lyft was optional, the economic reality was such that it was very difficult to earn a half-way decent living without also participating in the bonuses offered by Lyft.

62. Lyft's manner of assigning rides – including the frequency of ride assignment, the very short window within which a driver can accept rides and the threat of termination for failure to accept the vast majority of rides – prevented DALIS from engaging in personal or economically gainful activities while logged into the "Lyft App."  In other words, once logged into the Lyft App, DALIS was committed to Lyft's business and couldn't be engaged in any other gainful activity.

63. DALIS logged out of the Lyft App at all times when he was not engaged in providing a ride for Lyft or making himself available for the next ride. When performing other types of work for Lyft, DALIS typically logged out of the App. For example, DALIS typically logged out when he pumped gas, performed vehicle maintenance and repairs, cleaned his car or used the restroom. He scheduled his work and personal activities to minimize the risk of missing ride assignments.

64. Lyft recognizes that drivers' time while logged into the App is not their own. Specifically, Lyft advised drivers including DALIS to log out and take a break if they did not plan to accept ride assignments: ***"If you can't or don't want to accept ride requests, we recommend taking a break."*** https://help.Lyft.com/hc/en-us/articles/115013077708-Acceptance-rate   (Last visited January, 2020).

65. Lyft employed a rider feedback and a 5-star rating system to evaluate the performance of DALIS. Lyft reserved the right to terminate DALIS if he fell below 4.6 rating out of 5.0. The star rating system was flawed, abusive and uneven-handed. Complaints by drivers and riders were handled differently. DALIS' serious complaints were ignored while similar or less serious complaints by riders were serious enough in the eyes of Lyft to warrant deactivation of his account. Despite the pleasant experience DALIS had with the majority of riders, few unfair ones were able to inflict harm on DALIS abusing the Lyft's uneven-handed complaint handling. A 4-star rating, for

instance, which was supposed to mean "good" performance in the eyes of riders could result in Lyft's deactivation of DALIS in theory. In fact, many riders didn't know that rating a driver 4-star out of five was derogatory and could result in the deactivation of the driver. Lyft didn't educate the riders that less than 5 stars rating given to the driver should only mean unhappy ride experience. Although Lyft claimed that the star rating system was for improving the ride experience and encouraged DALIS and the rider to rate each other, in reality Lyft used the star rating system to supervise and control DALIS, the effect of which was replacing costly direct workplace supervision with zero-cost intrusive and penalizing one, inconsistent with the theme of marketplace neutrality and independent contractor relationship all done through the singularity of the Lyft's App. Although DALIS maintained a consistent rating of 4.6 or greater, the flaws of the rating system caused tense exchange with Lyft and contributed to the deterioration of the relationship between DALIS and Lyft. (For more on the flaws of the 5-star rating system, please                                                   see https://www.buzzfeednews.com/article/carolineodonovan/the-fault-in-five-stars

66.   Despite its general Disclaimers in the TOS and its claimed marketplace neutrality, Lyft used its App technology to supervise, control, discipline and terminate.

67.  Lyft's investment in its App, which Lyft used to operate and manage its entire business model, far exceeded the value of his personal car and mobile phone.

68.  Without access to the Lyft's App, which gave DALIS legal and commercial right to connect with riders, DALIS was not able or permitted by law to use his personal car and mobile phone to transport riders.

69.  **Overtime and minimum wage**. Lyft did not pay DALIS overtime for hours worked over eight in a day or over 40 in a week. Furthermore, although Lyft suffered or permitted DALIS to log on to the Lyft App and make himself available to pick up rides, Lyft failed to pay DALIS while he was logged on but not providing a ride. In this way, Lyft failed to pay the minimum wage for all hours actually worked and instead limited DALIS to a piece rate for each ride. Even limiting the calculation of minimum wage to the hours DALIS was engaged in providing a ride, Lyft failed to pay him a minimum wage for all hours worked.

70.  **Expense reimbursement**. DALIS' necessary expenses incurred as a direct consequence of the discharge of his duties for Lyft included mileage costs; car insurance; cell phone service to perform driving services, receive driving requests, and maintain required email and/or text message contact with Lyft; and car cleaning and repair to comply with Lyft requirements, among other expenses. Lyft did not reimburse DALIS for work-related expenses.

71. **Wage statements and time records**. Lyft's wage statements did not clearly itemize earnings in such a way that DALIS could readily identify whether he received all pay for which he was eligible under the law, such actual worked hours, overtime, and minimum wages. Payroll records similarly failed to track all pay accurately.

72. **Willfulness**. Lyft is not a stranger to the charge of misclassification. To date, Lyft has continued to misclassify drivers as independent contractors notwithstanding that its classification policy has been the subject of many lawsuits nationwide. In some major cases, Lyft incurred a huge amount of money in settlement to avoid litigating misclassification. In some jurisdictions like California, Courts determined that a jury could reasonably find that Lyft drivers were employees under California law under the more stringent pre-*Dynamex* standard. Lyft has also not changed its policy despite the California Supreme Court's decision in *Dynamex Operations W., Inc. v. Superior Court*, 4 Cal.5th 903 (2018). Lyft's refusal to reclassify its drivers as employees all over the country, in particular in California where the law has become clear after the AB5 initiative, was willful and punishable under Colorado law. (See HB19-1267, Penalties for Failure to Pay Wages.) Despite Lyft having to settle class-action suits in the millions based on misclassification, Lyft never ceased to misclassify its derivers including DALIS.

## MISCLASSIFICATION CLAIM

73.  DALIS incorporates all of the above allegations as if they were set forth again herein.

74.  At all times relevant, DALIS had been a worker for Lyft under a contract agreement (TOS).

75.  DALIS is seeking a Declaratory Judgment to decide the following:

- Whether DALIS was employee or an independent contractor doing services for Lyft;

- Whether Lyft failed to reimburse DALIS for work-related expenses;

- Whether Lyft failed to pay DALIS overtime;

- Whether Lyft failed to pay DALIS the minimum wage for all hours worked;

- Whether Lyft failed to provide DALIS with itemized wage statements;

- Whether Lyft kept accurate payroll records for DALIS;

- Whether Lyft failed to provide meal and rest breaks for DALIS;

- Whether Lyft's policies and practices violated the FLSA, Colorado Labor Standards of proper work classification, Colorado Wage Orders in effect at the time, C.R.S. § 8-4-103; C.R.S. § 8-4-109, and CESA;

- Whether Lyft's classification of DALIS as independent contractor was willful; and

- The proper measure of damages sustained by DALIS as a result of misclassification.

## <u>BREACH OF CONTRACT CLAIM</u>

76. DALIS incorporates all of the above allegations as if they were set forth again herein.

77. At all times relevant, DALIS had been a worker for Lyft under a contract agreement (TOS).

78. Although Lyft declared DALIS as an independent contractor in the TOS, Lyft forced terms, policies and practices inconsistent with the theme of independent contractor relationship on DALIS.

79.   Lyft's terms, policies and practices had the effect of nullifying the promise of the independent contractor relationship.

80.   As a result of such terms, policies and practices, DALIS was deprived of independence, flexibility and realization of profit.

81.   Lyft employed such terms, policies and practices to supervise, evaluate, discipline and terminate DALIS.

82.   There was nothing in the TOS language that explicitly gave Lyft the power to arbitrate disputes between DALIS and the rider.

83.   If this Honorable Court finds that any of the TOS provisions was ambiguous as to whether Lyft had a contractual power to arbitrate disputes, discipline or terminate DALIS, DALIS asks the Court to resolve the ambiguities in favor of DALIS and against Lyft as the drafter of the TOS and against the party with the bigger bargaining power.

84.   Part of the TOS was Lyft's general Disclaimers section where Lyft in essence confirmed its marketplace neutrality and distanced itself from the actions and inactions of both the driver and the rider.

85. Lyft breached its marketplace neutrality by arbitrating disputes between DALIS and riders.

86. As a result of Lyft's employment and enforcement of such terms, policies and practices, DALIS was deactivated several times and finally terminated on November 4th, 2018.

87. The enforcement of such terms, policies and practices by Lyft constituted a breach of contract.

88. Lyft breached its contract with DALIS when Lyft deactivated DALIS for a nearly five months upon claims of personal injury filed by Ms. Covington, despite the fact that Ms. Covington's claims were denied by Lyft and/or its insurer.

89. In its response to the general allegations in the complaint of Ms. Covington, Lyft continues to assert that it was "without sufficient knowledge to accept or deny…" the allegations of Ms. Covington. (See Lyft's Response to Ms. Covington's Complaint," hence admitting that Lyft was without good cause to deactivate DALIS for nearly five months during which DALIS lost income and experienced emotional distress.

90.  In any event, Lyft carried a commercial insurance policy mandated by law and public policy to protect the public from claims of negligence against DALIS in the course of performing duties for Lyft.

91.  Lyft followed a policy of "deactivate first and investigate later" which policy harmed DALIS. Lyft deactivated DALIS for nearly five months depriving DALIS from earning income while investigating Covington's claims.

92.  Lyft deactivated DALIS before the conclusion of its investigation of Ms. Covington's claim.   Neither was Lyft in a position to deactivate nor was its policy fair. The deactivation constituted a breach of contract.

93.  As a result of Lyft's breach of contract, DALIS lost past and future income.

94.  In addition to loss of income, DALIS suffered emotional distress.

95.  DALIS seeks the amount of the respective losses above, interest, cost and legal fees as applicable and any such other legal and equitable relief as the Court deems just and proper.

96.  Because the conduct of Lyft was willful, DALIS is seeking exemplary damages.

## UNJUST ENRICHMENT CLAIM

97.     DALIS incorporates by reference all other paragraphs as if they were set forth again herein.

98.     At all times relevant, DALIS had been a worker for Lyft under a contract agreement (TOS).

99.     Either way as an employee or as an independent contractor, DALIS lost the benefits entitled under each classification.

100.   Lyft profited from DALIS' losses. DALIS' losses were Lyft's gain.

101.    DALIS is entitled to recover his losses under the theory of unjust enrichment.

102.    The TOS contained misrepresentations and deceptions.

103.   DALIS' claim of unjust enrichment is proper as a tort claim.

104.    DALIS lost past and future income as a result of Lyft's unjust enrichment.

105.   DALIS suffered emotional distress as a result of Lyft's unjust enrichment.

106.    DALIS seeks the amount of the respective losses above, interest, cost and legal fees as applicable and any such other legal and equitable relief as the Court deems just and proper.

107.    Because the conduct of Lyft was willful, DALIS is seeking exemplary damages.

## Bad Faith and Unfair Dealing

108.    DALIS incorporates by reference all other paragraphs as if they were set forth again herein.

109.    At all times relevant, DALIS had been a worker for Lyft under a contract agreement (TOS).

110.    Either way as an employee or as an independent contractor, DALIS lost the benefits entitled under each classification.

111.    In particular, Lyft exercised excessive control over Dalis to such a degree that Lyft appointed itself as arbitrator between Dalis and his riders. Lyft lacked the contract basis and legal legitimacy to arbitrate disputes between Dalis and his riders. The excessive control and possessive role of arbitration constituted bad faith and unfair dealing against Dalis. As a result, Dalis was

occasionally deactivated and finally terminated. Dalis suffered economic and non-economic damages.

## LABOR LAW VIOLATIONS
## FIRST CLAIM FOR RELIEF
### (Minimum Wage Claim under 29 U.S.C. § 206)

112.   DALIS incorporates by reference all other paragraphs as if they were set forth again herein.

113.   At all times relevant, Lyft had been an employer and DALIS had been an employee under Colorado and Federal law entitled to the protections of the FLSA, **29 U.S.C. § 206.**

114.   The foregoing conduct, as alleged, constitutes a violation of 29 U.S.C. § 206, which protects DALIS' right to earn a minimum wage and provides for damages and punishment for violations of that right.

115.   In particular, the applicable minimum wage in Colorado was around $8.23 to $10.20 an hour (Colorado minimum wage is greater than and hence overrides the Federal minimum wage.)   During the period relevant to this case, DALIS regularly earned less than the minimum due to the significant deductions from pay that Lyft made for gasoline, car insurance, car maintenance, and cell phone usage, as well as the other expenses noted

above. These expenses resulted in hourly rates of well less than the mandatory minimum wage based on the hours DALIS worked.

116.   Although DALIS periodically did not earn at least the minimum wage, Lyft had a policy and practice of failing and refusing to pay minimum wages for all hours worked and thus violated and continues to violate the above-referenced minimum wage protections.

117.   DALIS seeks the amount of the respective unpaid wages owed him, liquidated damages, attorneys' fees and costs as applicable pursuant to 29 U.S.C. §§ 201 et seq. and such other legal and equitable relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Overtime Claim, under 29 U.S.C. § 207)

118.   DALIS realleges and incorporates by reference all other paragraphs as if they were set forth again herein.

119.   At all times relevant, Lyft had been an employer and DALIS had been an employee under Colorado and Federal law entitled to the protections of the FLSA, **29 U.S.C. § 207.**

120. The foregoing conduct, as alleged, constitutes a violation of 29 U.S.C. § 207, which requires overtime pay for time worked over 40 hours in a week.

121. Although DALIS sometimes worked more than 40 hours in a week, Lyft had a policy and practice of failing and refusing to pay overtime and thus violated and continues to violate the above-referenced overtime provisions of the FLSA.

122. DALIS seeks the amount of the respective unpaid wages during the period relevant to this case  owed him, liquidated damages, attorneys' fees and costs as applicable pursuant to 29 U.S.C. §§ 201 et seq. and such other legal and equitable relief as the Court deems just and proper.

### **THIRD CLAIM FOR RELIEF**

### **(Minimum Wage Claim under Colorado Wage Order 35)**

123. DALIS realleges and incorporates by reference all other paragraphs as if they were set forth again herein.

124. At all times relevant, Lyft had been an employer and DALIS had been an employee under Colorado and Federal law entitled to the protections of the **Colorado Wage Order 35.**

125.   The foregoing conduct, as alleged, also constitutes a violation of the Colorado Wage Order 35, which similarly protects DALIS' right to earn a minimum wage and provide for damages and punishment for violations of that right.

126.   Although the applicable minimum wage in Colorado was $8.23 to $10.20, during the period relevant to this case, DALIS regularly earned less than the minimum due to the significant deductions from pay that Lyft made for gasoline, car insurance, car financing, cleaning and maintenance, and cell phone usage, as well as the other expenses noted above. These expenses resulted in hourly rates of well less than $8.23-10.20 based on the hours that DALIS worked.

127.   Although DALIS periodically did not earn at least the minimum wage, Lyft had a policy and practice of failing and refusing to pay minimum wage for all hours worked and thus violated and continues to violate the above-referenced minimum wage protections.

128.   DALIS seeks the amount of the respective unpaid wages owed him, liquidated damages, attorneys' fees and costs as applicable under Colorado Wage Order 35, and such other legal and equitable relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### (Overtime Claim under Colorado Wage Order 35)

129.   DALIS realleges and incorporates by reference all other paragraphs as if they were set forth again herein.

130.   At all times relevant, Lyft had been an employer and DALIS had been an employee under Colorado and Federal law entitled to the protections of the **Colorado Wage Order 35.**

131.   The foregoing conduct, as alleged, constitutes a violation of Colorado Wage Order 35, which requires overtime pay for time worked over eight hours in a day or over 40 hours in a week.

132.   Although when DALIS worked more than eight hours in a day or 40 hours in a week, Lyft had a policy and practice of failing and refusing to pay him overtime and thus violated and continues to violate the above-referenced overtime provisions of the Colorado Wage Order 35.

133.   DALIS seeks the amount of the respective unpaid wages owed him, liquidated damages, attorneys' fees and costs as applicable  under Colorado Wage Order 35, and such other legal and equitable relief as the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

## (Failure to Reimburse Necessary Expenses under Unjust Enrichment and Wage Order 35)

134.   DALIS realleges and incorporates by reference all other paragraphs as if they were set forth again herein.

135.   At all times relevant, Lyft had been an employer and DALIS had been an employee under Colorado and Federal law entitled to the protections of Colorado and Federal law protecting the right of an employee to earn minimum wage.

136.   Since minimum wage was impossible to realize without factoring in work related expenses incurred in the course of employment by the employee, DALIS is seeking reimbursement for such related expenses incurred while providing a service for Lyft.

137.   Since Lyft profited from the work related expenses DALIS incurred while providing a service for Lyft, Lyft's failure to compensate DALIS for such expenses constituted unjust enrichment. Lyft failed to reimburse DALIS for all work-related expenses and thus violated Colorado Wage Order 35, which guaranteed Colorado minimum wage.

138. Lyft's failure to reimburse DALIS for work related expenses was a de facto violation of Colorado minimum wage protection under Colorado Wage Order 35.

139. DALIS had incurred expenses necessary for driving for Lyft that included mileage costs; car insurance; cell phone service to perform his driving duties, receive driving requests, and maintain required email and/or text message contact with Lyft; and car cleaning and repair to comply with Lyft requirements, among other expenses.

140. DALIS seeks the amount of unpaid expenses owed him, interest, attorneys' fees and costs as applicable pursuant to Colorado Wage Order 35, and such other legal and equitable relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### (Wage Statement Claim under Colorado Revised Statutes, 8-4-103(4))

141. DALIS realleges and incorporates by reference all other paragraphs as if they were set forth again herein.

142. At all times relevant, Lyft had been an employer and DALIS had been an employee under Colorado and Federal law entitled to the protections of the **Colorado Revised Statutes, 8-4-103(4).**

143. The foregoing conduct, as alleged, constitutes a violation of Colorado Revised Statutes 8-4-103(4) and Wage Order 35, which provides requirements for properly itemized wage statements.

144. The wage statements Lyft provided to DALIS did not clearly itemize hours worked, an hourly wage, overtime, or earnings in a way that readily identified whether DALIS received all applicable pay for which he was eligible. Lyft thus violated and continues to violate Colorado Revised Statutes 8-4-103(4) and Colorado Wage Order 35.

145.  DALIS seeks to recover the greater of all actual damages or the dollar amount penalty for the initial pay period in which a violation occurred and the dollar amount penalty for each violation in a subsequent pay period, not to exceed an aggregate penalty of seven thousand five hundred dollars ($7,500), as well as costs and attorneys' fees as applicable.

## **SEVENTH CLAIM FOR RELIEF**

### **(Meal and Rest Break Claim under Colorado Wage Order 35)**

146. DALIS realleges and incorporates by reference all other paragraphs as if they were set forth again herein.

147.    At all times relevant, Lyft had been an employer and DALIS had been an employee under Colorado law and was entitled to the protections of **Colorado Wage Order 35.**

148.    The foregoing conduct, as alleged, constitutes a violation of Wage Order 35, which provide for a 30-minute meal break for employees who work five hours or more in a day and for 10-minute breaks for every two hours worked.

149.    Although DALIS typically worked four to five hours or more in a day, Lyft had a policy and practice of failing to provide lawful meals and rest breaks. Lyft thus violated and continues to violate the above-referenced meal and rest break provisions of the Colorado Wage Order 35.

150.    Pursuant to Lyft's policy of classifying DALIS as independent contractor, Lyft lacked a meal or rest break policy that complied with Colorado law. In the absence of such policies, and because Lyft's policies and practices incentives DALIS to work constantly, regularly worked five or more hours in a day without taking an off-duty meal break and worked more than two hours without taking an off-duty rest break. For example:

- Lyft queued up the next rider before the current rider was dropped off, therefore, DALIS had to cancel a rider request in order to log out for meal and rest breaks;

- Lyft penalized DALIS for declining rider requests by lowering his acceptance rate, which must be 90% or better. If DALIS refused too many rider requests, DALIS risked employment termination;

- To be eligible for Lyft's Power Driver Bonus and other incentive payments, DALIS had to be online many hours a week (usually at least 50 per week), provide a certain number of rides, had to have an acceptance rate of 90% or higher, and/or remain online for long stretches during peak periods (usually for at least 50 minutes an hour). These policies discouraged DALIS from taking meals and rest breaks.

- In addition, because Lyft has cut its prices in order to compete with other rideshare companies, DALIS had to work much longer hours in order to make a living. This circumstance also strongly discouraged DALIS from taking meals and rest breaks.

151.    DALIS seeks the amount of the respective pay owed – one hour of compensation for each workday that the meal or rest period is not provided – interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### **PRAYER FOR RELIEF**

**WHEREFORE**, DALIS prays for relief as follows:

a. A declaratory judgment that the practices complained of herein are unlawful;

b. An injunction against Lyft and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

c. Statutory penalties;

d. An award of damages and restitution to be paid by Lyft according to proof;

e. Pre-judgment and post-judgment interest, as provided by law;

f. Attorneys' fees, as warranted under Federal and State Labor Code, CESA, Worker's Compensation, Unemployment Insurance and Wage Orders as applicable.

g. Costs of suit, including expert fees and costs;

h. Such other injunctive and equitable relief as the Court may deem just and proper.

i. DALIS reserves the right to amend this Cross-Claim based on future discovery.

Respectfully submitted,

Ibrahim Dalis, pro se,

*August 31st, 2020*

## Jury Demand

Plaintiff requests a jury trial on all issues so triable.

## CERTIFICATE OF SERVICE

Defendant DALIS certifies that a true and correct copy of the above foregoing **COMPLAINT, JURY DEMAND AND MOTION FOR DECLARATORY JUDGMENT** was pre-posted and (e)mailed or hand-delivered on the _31st_ day of _August_ , 2020 to the following parties:

Counsel for Defendant Lyft, Inc.:
Ryan Gill, Esq.
Lewis Brosbois Bisgaard & Smith, LLP
1700 Lincoln Street, Suite 4000
Denver, CO 80203
Phone: 303-861-7760
ryan.gill@lewisbrisbois.com

mls@denverlawfirm.com

Respectfully submitted,
IbrahimDalis, pro se,

<table>
<tr><td>

DISTRICT COURT<br>
CITY & COUNTY OF DENVER, COLORADO<br>
1437 BANNOCK STREET<br>
DENVER, COLORADO 80202

</td><td>

DATE FILED: September 1, 2020 2:21 PM<br>
CASE NUMBER: 2020CV381

▲ **COURT USE ONLY** ▲

</td></tr>
<tr><td>

Plaintiff: IBRAHIM DALIS,

v.

Defendant: LYFT, INC.

</td><td>

**Case Number: 20CV381**

**Courtroom:  269**

</td></tr>
</table>

## DELAY REDUCTION ORDER

All civil courtrooms are on a delay reduction docket.

**IF AN ATTORNEY OR PRO SE PARTY FAILS TO COMPLY WITH THIS ORDER, THE COURT MAY DISMISS THE CASE WITHOUT PREJUDICE.  THIS ORDER IS THE INITIAL NOTICE REQUIRED BY C.R.C.P 121 § 1-10, AND C.R.C.P. 41(B)(2).**

A.    In all civil actions, the following deadlines must be met:

1.    **Service of Process:**  Proof of service of process under C.R.C.P. 4 for all defendants must be filed within **63 days** after the date of filing of the complaint. After **63 days**, the action may be dismissed by the Court against any defendant for whom proof of service has not been filed.

2.    **Default:**  Motions for default must be filed within **14 days** after default has occurred, and must comply with C.R.C.P. 121(c) § 1-14.  Reasonable inquiry regarding a person's military status requires confirmation through the Department of Defense's Servicemembers Civil Relief Act website (https://scra.dmdc.osd.mil) or equivalent confirmation.

3.    **Trial Setting:**  The Responsible Attorney as defined in C.R.C.P. 16(b)(2) must file and serve a Notice to Set the case for trial and must complete the setting of the trial no later than **14 days** from the date the case is at issue. Counsel may call the courtroom to set trials only on Tuesdays, Wednesdays, and Thursdays from 10:00 a.m. until noon.

4.   **Cases filed under C.R.C.P. 16:**

   a)   **Case Management Conference:**   The notice to set trial must also include a notice to set a Case Management Conference to be held no later than **49 days** after the case is at issue.   Counsel may call the courtroom to set case management conferences only on Tuesdays, Wednesdays, and Thursdays from 10:00 a.m. until noon.

   b)   **Proposed Case Management Order:**   At least **7 days** before the Case Management Conference, the parties must file a proposed Case Management Order.

   c)   **Waiver of Case Management Conference:**   If all parties are represented by counsel, a joint request to waive the case management conference may be included in the proposed Case Management Order. Unless such a request has been granted, counsel must appear for the case management conference.

5.   **Cases filed under C.R.C.P. 16.1:**

   **Certificate of Compliance:**   Not later than **49 days** after the case is at issue, the Plaintiff (or the Responsible Attorney) must file a Certificate of Compliance as required under C.R.C.P. 16.1(h).   No Case Management Order or Case Management Conference is required.

B.   Additionally, in all civil actions the following provisions apply:

1.   **Service of this Order**.   The Plaintiff or Responsible Attorney must send a copy of this Order to all other parties who enter their appearance.

2.   **Related Cases.**   An attorney entering an appearance in this case who is aware of a related case is ordered to complete and file in this case an Information Regarding Related Case(s) form, available in Room 256 of the City and County Building or on line at: https://www.courts.state.co.us/userfiles/file/Information_Regarding_Related_Cases_Form(1).doc

DATE: THIS 1ST DAY OF SEPTEMBER, 2020.

BY THE COURT:

Michael J. Vallejos
District Court Judge
Second Judicial District

2

Revised Sept. 2019 in perpetuity, B(1) corrected 2/19/20

Denver District Court
1437 Bannock, Room 256
Denver, CO 80202

| District Court, _Denver_ County, Colorado<br>Court Address: | |
|---|---|
| | DATE FILED: October 27, 2020<br>CASE NUMBER: 2020CV381 |
| Plaintiff _Ibrahim Dalis_ | |
| v. | ▲   **COURT USE ONLY**   ▲ |
| Defendant<br>_Lyft, INC._ | Case Number:<br>_2020 CV 381_ |
| | Division:          Courtroom: _269_ |

**DISTRICT COURT CIVIL SUMMONS**

TO THE ABOVE NAMED DEFENDANT: _____Lyft, INC._____

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within 35 days after such service upon you. Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

Dated: _10-27-2020_

OCT 27 2020

_____
Clerk of Court/Clerk

_____
Signature of Plaintiff

_17509 E. Temple Dr._
Address of Plaintiff

_Aurora Co 80015_
_720-965-3280_
Plaintiff's Phone Number

**This Summons is issued pursuant to Rule 4, C.R.C.P., as amended. A copy of the Complaint must be served with this Summons. This form should not be used where service by publication is desired.**

**WARNING:** A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal. The plaintiff has 14 days from the date this summons was served on you to file the case with the court. You are responsible for contacting the court to find out whether the case has been filed and obtain the case number. If the plaintiff files the case within this time, then you must respond as explained in this summons. If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.

TO THE CLERK: If the summons is issued by the clerk of the court, the signature block for the clerk or deputy should be provided by stamp, or typewriter, in the space to the left of the attorney's name.

JDF 600   R10-13   DISTRICT COURT CIVIL SUMMONS

RECEIVED OCT 2 7 2020

FILED...
DISTRICT COURT
DENVER, COLORADO

ORIGINAL_____M

2020 NOV 12 ___

DATE FILED: November 12, 2020
CASE NUMBER: 2020CV381

☐County Court ☑District Court
Denver_____ County, Colorado
Court Address:
1437 Bannock St

Plaintiff/Petitioner(s): Ibrahim Dalis

v.

Defendant/Respondent(s): Lyft, INC.

▲ **COURT USE ONLY** ▲

Attorney or Party Without Attorney (Name and Address):
Ibrahim Dalis

Phone Number: 720.965  E-mail: dalisabe@gmail.com
FAX Number: 3280  Atty. Reg. #:

Case Number:
2020CV381

Division Civil  Courtroom 269

## AFFIDAVIT OF SERVICE

I declare under oath that I am 18 years or older and not a party to the action and that I served THE FOLLOWING DOCUMENTS Summons Complaint Jury demand, on the Defendant/Respondent in Arapahoe, Co , (name of County/State) on 10-30-2020 (date) at 1:55 pm (time) at the following location: 7700 E. Arapahoe Rd Suite 220 Centennial, Co 80112

☑By handing the documents to a person identified to me as the Defendant/Respondent: Emily / CT Corporation (print name of person served). Emily Lopan

☐By identifying the documents, offering to deliver them to a person identified to me as the Defendant/Respondent who refused service, and then leaving the documents in a conspicuous place.

☐By leaving the documents at the Defendant/Respondent's usual place of abode with _____ (Name of Person) who is a member of the Defendant/Respondent's family and whose age is 18 years or older. (Identify family relationship)_____.)

☐By leaving the documents at the Defendant/Respondent's usual workplace with _____ (Name of Person) who is the Defendant/Respondent's secretary, administrative assistant, bookkeeper, or managing agent. (Circle title of person served.)

☐By leaving the documents with _____ (Name of Person), who as _____ (title) is authorized by appointment or by law to receive service of process for the Defendant/Respondent.

☐By serving the documents as follows (other service permitted by C.R.C.P 4(g) or C.R.C.P. 304(c)(d) and (e):
_____.

☐**For Eviction Cases Only.**
I have made diligent efforts such as _____ (list personal service attempts) but have been unable to make personal service on the Defendant/Respondent(s) and I have made service of the within summons and complaint by posting a copy of them in a conspicuous place upon the premises described therein.

**I have charged the following fees for my services in this matter:**

☐Private process server

☐Sheriff, _____ County
Fee $_____  Mileage $ 26 miles + 26 miles at 0.56 per mile

☑ By checking this box, I am acknowledging I am filling in the blanks and not changing anything else on the form.

☐ By checking this box, I am acknowledging that I have made a change to the original content of this form.

## VERIFICATION

**I declare under penalty of perjury under the law of Colorado that the foregoing is true and correct.**

Executed on the _6th_ day of ___November___, _2020_
     (date)           (month)         (year)

_Aurora, Co  80015_
(city or other location, and state OR country)

_Nibras Masri_         _NM_       _11-6-2020_
(Printed Signature)        Signature         Date

> FAIRA TABBASUM
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20064046420
> MY COMMISSION EXPIRES JUNE 24, 2023

State of _Colorado_ County of _Arapahoe_
Subscribed and sworn before me on _11-06-2020_
                                (Date)
      (Notary Signature)

<table>
<tr><td colspan="2">

DISTRICT COURT, DENVER COUNTY, COLORADO

1437 Bannock Street, Room 256
Denver, CO 80202

DATE FILED: November 17, 2020 7:08 PM
FILING ID: F3B69ADD1059D
CASE NUMBER: 2020CV381

</td></tr>
</table>

| | |
|---|---|
| **PLAINTIFF:** <br><br> **IBRAHIM DALIS** <br><br> v. <br><br> **DEFENDANT:** <br><br> **LYFT, INC.** | <br><br><br> ▲COURT USE ONLY▲ |
| Attorneys for: Lyft, Inc. <br> Name(s)     Roger G. Trim # 39708 <br>         Raul Chacon, Jr. #43708 <br>         Ogletree, Deakins, Nash, Smoak & <br>         Stewart, P.C. <br>         2000 S. Colorado Blvd. <br>         Tower 3, Suite 900 <br>         Denver, CO 80222 <br> Phone Number:    303-764-6800 <br> Fax Number:       303-831-9246 <br> E-Mail:          roger.trim@ogletree.com <br>                 raul.chacon@ogletree.com | Case No.: 2020-CV-00381 <br><br> Ctrm/Div: 269 |

|  |
|---|
| **DEFENDANT'S MOTION FOR EXTENSION OF TIME TO ANSWER OR OTHERWISE RESPOND** |

Defendant Lyft, Inc. ("Lyft"), by and through its counsel, Ogletree, Deakins, Nash,

Smoak & Stewart, P.C., respectfully requests a 21-day extension of time, up through and

including December 11, 2020, for Lyft to respond to Plaintiff's Complaint, Jury Demand and

Petition for Declaratory Judgment (the "Complaint"). As grounds for this Motion, Lyft states as

follows:

1.      **Certificate of Compliance.** Pursuant to C.R.C.P. 121, § 1-15(8), undersigned

counsel for Lyft certifies that he conferred in good faith with Plaintiff Ibrahim Dalis, proceeding

pro se, on November 17, 2020 regarding the relief requested herein.  Mr. Dalis indicated that he opposes the relief requested herein.

2.      Plaintiff filed his Complaint on August 31, 2020.  The court issued a Summons to Lyft on October 27, 2020.  Plaintiff served Lyft a copy of his Complaint on October 30, 2020.

3.      Accordingly, Lyft's answer or other response to the Complaint is due on November 20, 2020.

4.      Counsel for Lyft was recently retained and requires additional time within which to investigate and prepare a response to the Complaint.

5.      Plaintiff's Complaint comprises a total of 42 pages and 151 individually numbered paragraphs.  As a result, it is not feasible to conduct an adequate inquiry into the factual allegations asserted in the Complaint prior to the current due date for Lyft's answer or other response.

6.      Moreover, Plaintiff asserts eleven claims consisting of the following: Misclassification Claim, Breach of Contract Claim, Unjust Enrichment Claim, Bad Faith and Unfair Dealing, Minimum Wage Claim under 29 U.S.C. § 206, Overtime Claim under 29 U.S.C. § 207, Minimum Wage Claim under Colorado Wage Order 35, Overtime Claim under Colorado Wage Order 35, Failure to Reimburse Necessary Expenses Under Unjust Enrichment and Wage Order 35, Wage Statement Under Colorado Revised Statutes, 8-4-103(4), and Meal and Rest Break Claim Under Colorado Wage Order 35. These claims will require legal analysis of federal wage and hour law pursuant to the Fair Labor Standards Act under multiple theories of recovery and will also require analysis of applicable state law. Given the breadth of Plaintiff's legal

theories, Lyft will require additional time to conduct legal analysis with respect to each claim asserted.

7.      Lyft will require a 21-day extension to sufficiently address each of Plaintiff's factual assertions and legal theories because various pieces of information will not be immediately obtainable due to the impending Thanksgiving holiday.  As a result, a 21-day extension is particularly necessary based on delays attributable to the holiday.

8.      Lyft has not previously requested any extensions of time to respond to the Complaint.

9.      Neither the Parties nor the Court will be prejudiced by granting this Motion.

10.     Pursuant to C.R.C.P. 121, § 1-11, undersigned certifies a copy of this Motion has been served upon Lyft.

WHEREFORE, Lyft respectfully requests a 21-day extension of time, up through and including December, 11, 2020, for Lyft to respond to Plaintiff's Complaint.

Respectfully submitted this the 17th day of November, 2020.

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.


By: *s/ Raul Chacon, Jr.*
        Roger G. Trim # 39708
        Raul Chacon, Jr. # 43708


*Attorneys for Defendant Lyft, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2020, a true and correct copy of the foregoing **MOTION FOR EXTENSION OF TIME TO ANSWER OR OTHERWISE RESPOND** was filed via the Court's E-Filing system, and served via U.S. mail and email, upon the following:

Ibrahim Dalis, Pro Se Plaintiff
17509 E. Temple Drive
Aurora, CO  80015
dalisabe@gmail.com

*s/ Barbara J. Esquibel*
Barbara J., Esquibel, Paralegal

4

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street, Room 256<br>Denver, CO  80202 | |
| | DATE FILED: November 17, 2020 7:08 PM<br>FILING ID: F3B69ADD1059D<br>CASE NUMBER: 2020CV381 |
| PLAINTIFF:<br><br>**IBRAHIM DALIS**<br><br>v.<br><br>DEFENDANT:<br><br>**LYFT, INC.** | ▲COURT USE ONLY▲ |
| | Case No.:  2020-CV-00381<br><br>Ctrm/Div:  269 |
| **PROPOSED ORDER GRANTING DEFENDANT'S MOTION FOR EXTENSION OF TIME TO ANSWER OR OTHERWISE RESPOND** | |

THIS MATTER is before the Court on Defendant Lyft, Inc.'s Motion for Extension of Time to File their Answer or Otherwise Respond (the "Motion"). The Court, having reviewed the Motion, the record, and being otherwise fully advised in the premises, hereby GRANTS the Motion. This Defendant is granted an additional 21 days to file its answer or other responsive pleading, which shall be due on or before December, 11, 2020.

DATED this ___ day of November, 2020.

BY THE COURT:


_____
District Court Judge

| DISTRICT COURT, DENVER COUNTY, COLORADO | |
|---|---|
| Court Address:<br>1437 BANNOCK STREET, RM 256, DENVER, CO, 80202 | DATE FILED: November 20, 2020 11:59 AM<br>CASE NUMBER: 2020CV381 |
| **Plaintiff(s)** IBRAHIM DALIS<br>v.<br>**Defendant(s)** LYFT INC | |
| | ⚠ **COURT USE ONLY** ⚠ |
| | Case Number:  2020CV381 |
| | Division:  269          Courtroom: |
| **Order:Defendant's Motion for Extension of Time to Answer or Otherwise Respond** | |

The motion/proposed order attached hereto: GRANTED.

The Court is aware that Plaintiff objects, however, as there is not sufficient time to await a response from Plaintiff without passing the deadline, and being aware that counsel was recently retained, and finally, that this case is only in its initial stages, the Court finds good cause for the requested extension.

The Motion therefore is Granted. Plaintiff shall have an extension of time, up through and including **December, 11, 2020**, for Lyft to respond to Plaintiff's Complaint.

Issue Date:  11/20/2020

*[signature]*

MICHAEL JAMES VALLEJOS
District Court Judge

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street, Room 256<br>Denver, CO 80202 | |
| **PLAINTIFF:**<br><br>**IBRAHIM DALIS**<br><br>v.<br><br>**DEFENDANT:**<br><br>**LYFT, INC.** | ▲COURT USE ONLY▲ |
| Attorneys for: Lyft, Inc.<br>Name(s)     Roger G. Trim # 39708<br>             Raul Chacon, Jr. #43708<br>             Ogletree, Deakins, Nash, Smoak &<br>             Stewart, P.C.<br>             2000 S. Colorado Blvd.<br>             Tower 3, Suite 900<br>             Denver, CO 80222<br>Phone Number:  303-764-6800<br>Fax Number:     303-831-9246<br>E-Mail:          roger.trim@ogletree.com<br>             raul.chacon@ogletree.com | Case No.: 2020-CV-00381<br><br>Ctrm/Div: 269 |
| **DEFENDANT'S MOTION FOR EXTENSION OF TIME TO ANSWER<br>OR OTHERWISE RESPOND** | |

Defendant Lyft, Inc. ("Lyft"), by and through its counsel, Ogletree, Deakins, Nash,

Smoak & Stewart, P.C., respectfully requests a 21-day extension of time, up through and

including December 11, 2020, for Lyft to respond to Plaintiff's Complaint, Jury Demand and

Petition for Declaratory Judgment (the "Complaint"). As grounds for this Motion, Lyft states as

follows:

       1.    **Certificate of Compliance.**  Pursuant to C.R.C.P. 121, § 1-15(8), undersigned

counsel for Lyft certifies that he conferred in good faith with Plaintiff Ibrahim Dalis, proceeding

pro se, on November 17, 2020 regarding the relief requested herein.  Mr. Dalis indicated that he opposes the relief requested herein.

2.      Plaintiff filed his Complaint on August 31, 2020.  The court issued a Summons to Lyft on October 27, 2020.  Plaintiff served Lyft a copy of his Complaint on October 30, 2020.

3.      Accordingly, Lyft's answer or other response to the Complaint is due on November 20, 2020.

4.      Counsel for Lyft was recently retained and requires additional time within which to investigate and prepare a response to the Complaint.

5.      Plaintiff's Complaint comprises a total of 42 pages and 151 individually numbered paragraphs.  As a result, it is not feasible to conduct an adequate inquiry into the factual allegations asserted in the Complaint prior to the current due date for Lyft's answer or other response.

6.      Moreover, Plaintiff asserts eleven claims consisting of the following: Misclassification Claim, Breach of Contract Claim, Unjust Enrichment Claim, Bad Faith and Unfair Dealing, Minimum Wage Claim under 29 U.S.C. § 206, Overtime Claim under 29 U.S.C. § 207, Minimum Wage Claim under Colorado Wage Order 35, Overtime Claim under Colorado Wage Order 35, Failure to Reimburse Necessary Expenses Under Unjust Enrichment and Wage Order 35, Wage Statement Under Colorado Revised Statutes, 8-4-103(4), and Meal and Rest Break Claim Under Colorado Wage Order 35. These claims will require legal analysis of federal wage and hour law pursuant to the Fair Labor Standards Act under multiple theories of recovery and will also require analysis of applicable state law. Given the breadth of Plaintiff's legal

theories, Lyft will require additional time to conduct legal analysis with respect to each claim asserted.

7.     Lyft will require a 21-day extension to sufficiently address each of Plaintiff's factual assertions and legal theories because various pieces of information will not be immediately obtainable due to the impending Thanksgiving holiday.  As a result, a 21-day extension is particularly necessary based on delays attributable to the holiday.

8.     Lyft has not previously requested any extensions of time to respond to the Complaint.

9.     Neither the Parties nor the Court will be prejudiced by granting this Motion.

10.     Pursuant to C.R.C.P. 121, § 1-11, undersigned certifies a copy of this Motion has been served upon Lyft.

WHEREFORE, Lyft respectfully requests a 21-day extension of time, up through and including December, 11, 2020, for Lyft to respond to Plaintiff's Complaint.

Respectfully submitted this the 17th day of November, 2020.

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.


By: *s/ Raul Chacon, Jr.*
    Roger G. Trim # 39708
    Raul Chacon, Jr. # 43708


*Attorneys for Defendant Lyft, Inc.*

3

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2020, a true and correct copy of the foregoing **MOTION FOR EXTENSION OF TIME TO ANSWER OR OTHERWISE RESPOND** was filed via the Court's E-Filing system, and served via U.S. mail and email, upon the following:

Ibrahim Dalis, Pro Se Plaintiff
17509 E. Temple Drive
Aurora, CO  80015
dalisabe@gmail.com

*s/ Barbara J. Esquibel*
Barbara J., Esquibel, Paralegal

4